IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　Plaintiff,<br><br>v.<br><br>JEFFEREY A. GORDON, BLUE ROCK VENTURES, LLC, and WINDY CITY ACCELERATED RETURNS VENTURE I, LLC<br><br>　　　Defendants. | Civil Action No.:<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges:

## NATURE OF THE ACTION

1. From approximately July 2016 through at least January 2018, securities fraud recidivist Jefferey A. Gordon ("Gordon") and two companies he controlled, Blue Rock Ventures, LLC ("Blue Rock") and Windy City Accelerated Returns Venture I, LLC ("Windy City") (collectively, "Defendants"), defrauded at least 18 investors out of approximately $1 million in an unregistered real estate-related securities offering.

2. Defendants offered and sold interests in Windy City to investors. With the proceeds of those sales, Defendants promised to acquire from Blue Rock interests in rental properties in the Chicago area (the "Rental Properties"). Defendants represented to investors that the Rental Properties were 100% rented and that investors could expect a 250%-350% return based on Gordon's plan to refinance the mortgages on the Rental Properties, increase their rents, and later sell them at a profit.

3. But, Blue Rock did not own interests in the Rental Properties. Gordon never acquired any material interests in the Rental Properties on behalf of Windy City, he did not improve the properties, and he did not refinance the mortgages. Instead, Gordon caused Windy City and Blue Rock to misappropriate investor money to fund his personal lifestyle, including luxury vacations and casino payments. Further, at the time Defendants made the claims about the Rental Properties being fully leased and about Gordon's ability to refinance mortgages, Gordon knew that: (i) the Rental Properties were not fully leased, (ii) he had been unsuccessful in attempting to refinance the mortgages on the Rental Properties; and (iii) the Rental Properties had lost over half of their value. As a result, Gordon lacked a reasonable basis to project a return of 250%-350%.

4. Through their actions, Defendants violated, and unless enjoined will continue to violate, the antifraud and securities-registration provisions of the federal securities laws, namely Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)].

5. To protect the public from further fraudulent activity, the SEC brings this action against Defendants and seeks: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains, plus prejudgment interest; (iii) civil penalties against Gordon; (iv) an injunction that restrains and enjoins Gordon from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any securities provided, however, that such injunction shall not prevent Gordon from purchasing securities listed on a national securities exchange for his own personal account; and (v) an officer and director bar against Gordon.

## DEFENDANTS

6.      **Jefferey A. Gordon** resides in Dallas, Texas.  Gordon is the President, CEO, and Manager of Blue Rock, and the Manager of Windy City Management (defined below).  At all relevant times, Gordon controlled both entities.  This Court has previously enjoined Gordon in connection with a different securities fraud.  On June 28, 2018, this Court entered a final judgment permanently enjoining Gordon and another of his companies from violating the federal securities laws and ordering them to pay approximately $7 million for defrauding investors in an oil and gas scheme.  *See SEC v. Texas Coastal Energy Company, LLC, et al.*, No. 3:18-cv-01587-L (N.D. Tex.).

7.      **Blue Rock Ventures, LLC ("Blue Rock")** is a Delaware limited liability company formed in 2015 with its principal office in Dallas, Texas.  At all relevant times, Gordon controlled Blue Rock.  Pursuant to the Management Agreement between Blue Rock and Windy City, Blue Rock managed the operations of Windy City.

8.      **Windy City Accelerated Returns Venture I, LLC ("Windy City")** is a Delaware limited liability company formed in 2016 with its principal office in Dallas, Texas.  Pursuant to the Limited Liability Company Agreement of Windy City, the manager of Windy City is Windy City Accelerated Returns Management, LLC ("Windy City Management"), and at all relevant times Gordon was the Manager of Windy City Management.  As such, Gordon controlled Windy City through his role as Manager of Windy City Management.

## JURISDICTION AND VENUE

9.      The Commission brings this action pursuant to authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

10. The Defendants offered and sold units in Windy City to investors. These units are investment contracts, which are securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c].

11. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 US.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

12. In connection with the conduct described in this Complaint, Defendants, directly or indirectly, made use of the mails or the means or instruments of transportation or communication in interstate commerce.

13. Venue is proper in this District because Gordon resided in this District at all relevant times and at least some investors in Windy City reside in this District. Further, acts, transactions, and courses of business constituting violations of the securities laws alleged in this Complaint occurred within this District, including but not limited to solicitations of investors (by marketing materials, telephone, and in-person) and acceptance of investment proceeds.

## FACTUAL ALLEGATIONS

**I.   Windy City Purported to Buy the Rental Properties**

14. In June 2016, Gordon agreed on behalf of Windy City to purchase from a friend and former business associate ("Associate1") interests in 13 Chicago-area real estate properties (defined above as the "Rental Properties"). Prior to the purported transaction, the Rental Properties were owned by Associate1's two holding companies (the "Rental Companies"). The Rental Companies were, in turn, owned by an Illinois limited liability company with its principal office in California (the "Parent Company"). Associate1 and his then-spouse were the owners of the Parent Company.

15. Gordon and Associate1 reached an understanding that Windy City would pay the Parent Company $550,000 to acquire the equity it held in the Rental Companies, and that Windy City would pay this amount and accumulate equity in the Rental Companies as it raised money from investors. On June 15, 2016, Associate1, on behalf of the Parent Company and the Rental Companies, and Gordon on behalf of Windy City, signed an ownership transfer document purporting to convey 90% of the Parent Company's equity in the Rental Companies to Windy City. This document lacked key terms, including the purchase price.

16. Gordon and Associate1 then executed a "Membership Purchase Agreement" between the Parent Company and Windy City. Dated December 31, 2016, this agreement specified that Windy City would either pay the Parent Company $550,000 or provide a promissory note in that amount in exchange for 100% of the equity in the Rental Companies.

17. Even though Gordon and Windy City raised nearly $1 million, neither one (or any other person or entity) paid the Parent Company $550,000 or provided any promissory note.

## II. Defendants Offered Units of Windy City to Investors

18. In July 2016, Defendants began to solicit potential investors in Windy City through, among other means, personal referrals, investor dinners hosted by Gordon, advertising on social media platforms (such as Facebook), and bulk email campaigns executed by third parties using content provided by Gordon. Gordon used lead lists he purchased from third parties to generate recipient lists for bulk emails and investor dinner invitations.

19. Defendants used several types of written materials to offer units of Windy City to investors: (i) a project "teaser" contained in the bulk emails, (ii) follow-up emails directed to individual investors, (iii) a project overview document (the "Overview"), and (iv) a private placement memorandum ("PPM"). The "teasers" in the bulk emails provided prospective

investors with basic information about the Rental Properties and instructed interested investors to contact Gordon at his Blue Rock email address. The Overview provided more detailed information, including the expected returns and exit strategy, specific information about the Rental Properties, and information about the project's sponsor (Blue Rock) and its team (including Gordon).

20. Gordon had ultimate control over the contents of the bulk email "teasers," the follow-up emails, the Overview, and the PPM. Gordon either drafted these documents or provided the content to others who then drafted them. Gordon either disseminated these documents himself or directed others to do so.

21. Defendants marketed the Windy City investment as "turn-key," with each unit entitling investors to a 1.1538% membership interest in Windy City. Gordon, through Windy City and Blue Rock, represented in the PPM that Windy City was offering 65 units in Windy City at $12,618 per unit, for total offering proceeds of approximately $820,170. Defendants ultimately offered and sold additional Windy City units for total offering proceeds of $947,515.

22. Gordon had no previous relationship with many of the investors to whom he offered Windy City units. Gordon found these investors through personal referrals, investor dinners, social media advertising, and bulk email campaigns. Some Windy City investors lacked financial sophistication, and Gordon did not take reasonable steps to verify that they were accredited. The Windy City offering was not registered with the Commission.

### III.  Defendants Marketed and Operated Windy City in Deceitful Ways

23. As detailed below, Gordon, through Blue Rock and Windy City, deceived investors by soliciting investments based on false statements about (i) ownership of and plans to purchase the equity in the Rental Companies, (ii) use of offering proceeds, (iii) attributes of the Rental

Properties, and (iv) projected returns. Gordon also used investor funds as his personal piggy bank and contrary to the terms of the PPM.

  A. *False and Misleading Statements about Ownership of the Rental Companies*

  24. Through the Overview and the PPM, Defendants misled investors about the fundamental premise of the investment – that investor funds would be used, primarily, to purchase interests in the Rental Properties.

  25. The PPM represented that "[u]pon a sale of a Unit in [Windy City], [Windy City] will then purchase a prorate [sic] percentage of [the Rental Companies] . . . from [Blue Rock], which owns the equity" of the Rental Companies.

  26. This statement in the PPM was false because at the time the PPM was disseminated to many individuals who invested in Windy City, Gordon already had been systematically misusing investor money to fund his personal lifestyle and expenses, instead of using the funds from earlier investors to purchase equity in the Rental Companies. The Defendants raised approximately $1 million from investors, but paid the Parent Company only $23,100, instead of the $550,000 that was owed.

  27. This misrepresentation was material because an investor would consider it important in making an investment decision to know that Defendants were misusing the proceeds from the offering and were not acquiring equity in the Rental Companies. Indeed, an investor could not expect to earn a return on investment if Windy City had no ownership interest in, and thus no right to the income and possible sales proceeds from, the Rental Properties.

  28. The statement was also false because at the time it was made, Blue Rock did not own equity in the Rental Companies – the Parent Company did. This misrepresentation was material because an investor would consider it important in making an investment decision to

7

know whether Windy City proposed to acquire equity in the Rental Companies from an affiliate (Blue Rock) that already owned this equity or from an independent third party.

29. Gordon knew, or was severely reckless in not knowing, that the PPM statement specified in paragraph 25 above was false. Gordon personally negotiated the agreement with Associate1 for the acquisition of the equity in the Rental Companies from the Parent Company, which means he knew that the Parent Company, not Blue Rock, was the owner of the Rental Companies. Further, Gordon controlled certain bank accounts into which Windy City investor funds were deposited, which he diverted for his unauthorized personal use. Gordon also indirectly controlled certain other bank accounts into which Windy City investor funds were deposited, though a relative was the signatory on these accounts. Gordon diverted and misused funds from those accounts for his own personal benefit. As such, Gordon knew that Windy City was not using investor money to acquire the equity in the Rental Companies from any entity, whether Blue Rock or the Parent Company.

30. The PPM also represented that the offering proceeds "will be paid to Blue Rock Ventures to cover the equity it owns in the project, as well as to reimburse them for other expenses, including, but not limited to, due diligence, legal, marketing, sales, and overhead costs and expenses, as well as profit to Blue Rock Ventures, LLC to compensate it for structuring the offering." As detailed above, this statement was false because Blue Rock did not own the equity in the Rental Companies. The statement also was false because at the time Defendants made this representation to many investors, Gordon was misappropriating the offering proceeds to fund his lifestyle rather than using proceeds as disclosed in the PPM. This misrepresentation was material because an investor would consider it important in making an investment decision to know how funds they invested would be spent. And, for the reasons detailed in paragraph 29 above, Gordon

knew, or was severely reckless in not knowing, that these statements were false at the time they were made.

31.     Defendants also misrepresented to investors the ownership of the Rental Companies in the Overview and the bulk emails. What is more, the misrepresentations in the Overview and the bulk emails conflicted with each other (and with the PPM). For example, the Overview stated that Windy City had already "purchased 90% of the equity" of the Rental Companies. The bulk emails stated that Blue Rock "currently has" the Rental Properties that it "acquired." Both of these statements were false because at the time they were made, neither Blue Rock nor Windy City owned any equity in the Rental Companies, and Windy City ultimately paid only about 4% of the equity purchase price – far less than what would entitle it to acquire 90% of the equity.

32.     These misrepresentations were material because an investor would consider it important to making an investment decision to know whether the entity into which they were investing actually owned equity in the Rental Companies. And, for the reasons detailed in paragraph 29 above, Gordon knew this statement was false at the time it was made.

  B. *False and Misleading Statements about Attributes of the Rental Properties and Projected Returns*

33.     In addition to making false and misleading statements about the crux of the offering – ownership of the Rental Companies and how investor funds would be used – Gordon also deceived investors about key attributes of the Rental Properties.

34.     In the bulk emails, the follow-up emails to individual investors, and in the Overview, Defendants claimed that the Rental Properties were "100% rented." This was false. At the time Defendants made the statement, not all Rental Properties were leased. This misrepresentation was material because an investor would consider it important in making an

9

investment decision to know whether the Rental Properties were fully leased. Gordon knew, or was severely reckless in not knowing, that the Rental Properties were not fully leased, because Gordon had access to, and reviewed leases for, the Rental Properties. Moreover, Gordon testified under oath that he knew that, at the time of the Windy City offering, all Rental Properties were not, in fact, leased.

35. Defendants touted not only the Rental Properties' current income by misrepresenting that they were fully leased, but also the ability to increase the income in the near future. Specifically, Defendants represented in the PPM that Windy City "expects to secure new loans [on the Rental Properties] in the near future with a more reasonable market rate which should drive down monthly costs via a lower interest rate, and increase the existing positive monthly cashflow." This statement was false and misleading because at the time Defendants made this statement to several investors, Gordon had already made extensive and unsuccessful efforts to refinance the properties, having been denied by approximately 20 different lenders. This misrepresentation was material because an investor would consider it important in making an investment decision to know whether Gordon could, in fact, increase cash flow on the project through refinancing of Rental Properties' mortgages. Gordon knew, or was severely reckless in not knowing, that this statement was false and misleading, because he personally attempted – and failed – to refinance the mortgages on the Rental Properties.

36. In a similar vein, Gordon told prospective investors, in emails and at dinner parties he hosted to solicit investments, that he would use investor funds to renovate the Rental Properties to increase their value. These statements were false because at the time Gordon made the statements to many investors, Gordon had already diverted investor funds toward his personal expenses. Because of this misappropriation, neither he nor the other Defendants were in a position

to pay the purchase price on the equity of the Rental Companies, much less for improvements to the Rental Properties. Ultimately, Windy City spent a *de minimis* amount (approximately $29,000) renovating the Rental Properties. This misrepresentation was material because an investor would consider it important in making an investment decision to know whether Gordon would use investor funds as promised to improve the Rental Properties and, thus, increase an investor's return potential. Gordon knew, or was severely reckless in not knowing, that this statement was false and misleading because through his direct and indirect control of Windy City's bank accounts, he personally controlled how Windy City spent investor funds.

37. Finally, Defendants misled investors about the projected returns on the Windy City project. In the Overview, Defendants indicated an "expected return" of 250%-339%. In the follow-up emails to individual investors, Gordon asserted that Blue Rock "conservatively" projected returns of 250%-350% in three to five years.

38. These statements were false and misleading, because Defendants lacked a factual basis to make these projections. Gordon knew, or was severely reckless in not knowing, that rather than deploying investor funds in ways that could actually generate returns by, for example, purchasing equity in the Rental Companies and making improvements to the Rental Properties, Gordon spent most of the investor funds on personal expenditures. Moreover, Gordon made the statements regarding projected returns when he knew, or was severely reckless in not knowing, that the Rental Properties were not fully leased and that he would not be able to re-finance the mortgages on the Rental Properties on more favorable terms. Gordon also knew in 2017, while he was still projecting these returns, that the collective equity of the Rental Properties decreased, from $600,000 at the time of the purported purchase of the Rental Companies to $200,000. Thus,

Gordon lacked a factual basis to project the stated returns. Whether Gordon had a factual basis to project investment returns would be important to an investor in making an investment decision.

    C.    *Gordon Misused Investor Funds*

39. Defendants raised at least $947,515 from at least 18 different investors in the Windy City offering. All of the investor funds were wired or deposited directly into bank accounts that Gordon controlled, either directly or indirectly through a relative who was the signatory on these accounts.

40. From the outset, Gordon caused Windy City and Blue Rock to use investor funds contrary to the representations in the PPM. He used the first investor funds to cover a negative $4,000 Blue Rock bank account balance, before transferring money to himself and paying personal expenses. Even though Gordon later spent approximately $29,000 on improvements to the Rental Properties, he did so only after successfully soliciting additional capital contributions from existing investors for this supposedly "turn-key" project (which should not have required additional capital from investors, as specified in the PPM). Further, Gordon did not use any investor money to refinance the Rental Properties, pay property taxes, or, in some cases, the existing mortgages on some of the properties. Instead, Gordon used investor funds, in part, to fund his personal lifestyle. He spent approximately $145,000 of investor funds on items such as luxury hotels, vacation rentals, restaurants, strip clubs, casinos, and private-school payments.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

*Against All Defendants*

41. Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

42. By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or severely recklessly:

   a. employed a device, scheme, or artifice to defraud; and/or

   b. made untrue statements of a material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c. engaged in an act, practice, or course of business which operated as a fraud or deceit upon a person.

43. By reason of the foregoing, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## SECOND CLAIM FOR RELIEF
**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

*Against All Defendants*

44. Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

45. By engaging in the acts and conduct alleged herein, Defendants, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, have:

   a. knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

  b. knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under they were made, not misleading; and/or

  c. knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

46. By reason of the foregoing, Defendants have violated and, unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**
**Violations of Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)]**

*Against All Defendants*

47. Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

48. By engaging in the conduct described herein, Defendants, directly or indirectly:

  a. made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect; and/or

  b. for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or

  c. made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium

of any prospectus or otherwise, securities as to which no registration statement had been filed.

49. By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

1. Permanently enjoining the Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

2. Ordering the Defendants to disgorge ill-gotten gains as a result of the violations alleged herein, plus prejudgment interest on those amounts;

3. Imposing civil penalties against Gordon pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws as alleged herein;

4. Imposing an injunction that restrains and enjoins Gordon from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any securities provided, however, that such injunction shall not prevent Gordon from purchasing securities listed on a national securities exchange for his own personal account;

5. Imposing a bar against Gordon from acting as an officer or director of a public company, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

6. Imposing such other and further relief as the Court may deem just and proper.

Dated: July 15, 2021

Respectfully submitted,

*s/Nikolay V. Vydashenko*
Nikolay V. Vydashenko
Texas Bar No. 24057029
James E. Etri
Texas Bar No. 24002061
United States Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 900-2638 (phone)
(817) 978-4927 (facsimile)
vydashenkon@sec.gov

ATTORNEYS FOR PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION