UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:21-CV-1642-B |
| JEFFEREY A. GORDON, BLUE ROCK VENTURES, LLC, WINDY CITY ACCELERATED RETURNS VENTURE I, LLC, | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION & ORDER

Before the Court is Plaintiff Securities and Exchange Commission ("SEC")'s Motion for Final Judgment by Default (Doc. 15). The Court heard argument on the motion at a hearing on October 27, 2021 at 1:30 p.m. (Doc. 19) to review the evidence for the findings requested within the motion. On the record at the hearing, the Court requested a recalculation of prejudgment interest, as discussed in more detail in § C(4). The Court **GRANTS** the SEC's motion in full with the recalculated prejudgment interest.

# I.

# BACKGROUND

A.      *Factual Background*[1]

This is a securities fraud case. Jefferey A. Gordon ("Gordon") used two companies that he controlled, Blue Rock Ventures, LLC ("Blue Rock") and Windy City Accelerated Returns Venture I, LLC ("Windy City")—collectively "Defendants"—to "defraud[] at least 18 investors out of approximately $1 million in an unregistered real estate-related securities offering" from approximately July 2016 through January 2018.[2] Doc. 1, Compl., ¶ 1. Defendants "sold interests in Windy City to investors" with the promise of acquiring rental properties from Blue Rock, but Blue Rock did not own the rental properties. *Id.* ¶¶ 2–3. Instead, Gordon used the "investor[s'] money to fund his personal lifestyle, including luxury vacations and casino payments." *Id.* ¶ 3.

"Gordon is the President, CEO, and Manager of Blue Rock, and the Manager of Windy City" Accelerated Returns Management, LLC ("Windy City Management"). *Id.* ¶¶ 6, 8. Blue Rock was at all times controlled by Gordon. *Id.* ¶ 7. Windy City Management is the Manager of Windy City. *Id.* ¶ 8. Gordon was the Manager of Windy City Management so "Gordon controlled Windy City through his role as Manger of Windy City Management." *Id.* "Pursuant to the Management Agreement between Blue Rock and Windy City, Blue Rock managed the operations of Windy City." *Id.* ¶ 7.

In 2016, Gordon agreed to purchase the equity in thirteen Chicago-area properties ("Rental

---

[1] The Court draws the following factual account from the SEC's Complaint (Doc. 1).

[2] After the alleged facts in this case, this Court permanently enjoined Gordon "from violating the federal securities laws and order[ed] [Gordon and the defendant entity] to pay approximately $7 million for defrauding investors in an oil and gas scheme." *Id.* ¶ 6; *see SEC v. Tex. Coastal Energy Co., LLC*, No. 3:18-cv-1587, (N.D. Tex. June 28, 2018).

Properties") on behalf of Windy City for $550,000. *Id.* ¶¶ 14–15. The Rental Properties were owned by "two holding companies ("Rental Companies")" that "were, in turn, owned by [a California-based company] (the "Parent Company")." *Id.* ¶ 14. Gordon "signed an ownership transfer document purporting to convey 90% of the Parent Company's equity in the Rental Companies to Windy City." *Id.* ¶ 15. Gordon also signed a "Membership Purchase Agreement" that "specified that Windy City would either pay the Parent Company $550,000 or provide a promissory note in that amount in exchange for 100% of the equity in the Rental Companies." *Id.* ¶ 16. As discussed below, despite raising nearly $1,000,000 in the Windy City offering, neither Gordon nor Windy City ever provided $550,000 or a promissory note to the Parent Company. *Id.*

Through "several types of written materials," including a private placement memorandum ("PPM")—all under the "ultimate control" of Gordon, Defendants marketed 65 "turn-key" units of Windy City to investors "at $12,618 per unit . . . for total offering proceeds of $820,170." *Id.* ¶¶ 19–21. Through these written materials, Defendants "ultimately offered and sold additional . . . units," raising a total of $947,515. *Id.* ¶ 21. Gordon did not register the Windy City offering with the SEC. *Id.*

Defendants' written materials misled the Windy City investors to believe that their investments "would be used, primarily, to purchase interest in the Rental Properties." *Id.* ¶ 24. For example, the PPM stated that "[u]pon a sale of a Unit in [Windy City], [Windy City] will then purchase a prorate [sic] percentage of [the Rental Companies] . . . from [Blue Rock], which owns the equity." *Id.* ¶ 25 (alterations in original). But, Defendants only paid the Parent Company $23,100 of the $947,515 raised from investors. *Id.* ¶ 26. The PPM also stated "that the offering proceeds 'will be paid to Blue Rock Ventures to cover the equity it owns in the project, as well as to reimburse

them for other expenses, including, but not limited to, due diligence, legal, marketing, sales, and overhead costs and expenses, as well as profit to Blue Rock Ventures, LLC to compensate it for structuring the offering.'" *Id.* ¶ 30. Other written materials presented conflicting information that "Windy City had already 'purchased 90% of the equity'" and Blue Rock "currently has" the Rental Properties. *Id.* ¶ 31. All of these written materials were false because "Blue Rock did not own equity in the Rental Companies—the Parent Company did." *Id.* ¶¶ 28, 30.

Defendants also made false and misleading statements regarding material attributes of the Rental Properties. *Id.* ¶¶ 33–38. Some of the written materials claimed the Rental Properties were "100% rented" when in fact, they were not. *Id.* ¶ 34. Defendants also claimed "that Windy City 'expects to secure new loans [on the Rental Properties] in the near future with a more reasonable market rate which should drive down monthly costs via a lower interest rate, and increase the existing positive monthly cashflow.'" *Id.* ¶ 35 (alteration in original). But, "approximately twenty different lenders" had already denied Gordon a loan. *Id.* Gordon also told investors that he intended to use investor funds "to renovate the Rental Properties." *Id.* ¶ 36. Instead, Gordon "diverted investor funds toward his personal expenses" and spent approximately $29,000 on renovations to the Rental Properties. *Id.* Finally, Defendants misled investors by promising an expected return of "250%–339%" or a "conservative[]" estimate of "250%–350%" in three to five years. *Id.* ¶ 37. While projecting these returns, Gordon knew, or was severely reckless in not knowing, that the equity in the Rental Properties had decreased from $600,000 to $200,000, the Rental Properties were not fully leased, and that he would not be able to re-finance at a lower rate. *Id.* ¶ 38. "Thus, Gordon lacked a factual basis to project the stated returns." *Id.*

Gordon controlled the bank accounts containing the investor funds "either directly or indirectly through a relative who was the signatory on these accounts." *Id.* ¶ 39. He used funds contrary to the material representations to investors "to cover a negative $4,000 Blue Rock bank account balance" and fund $145,000 in personal lifestyle expenses that included "hotels, vacation rentals, restaurants, strip clubs, casinos, and private-school payments." *Id.* ¶ 40.

B.   *Procedural Background*

The SEC filed its Complaint on July 15, 2021, alleging violations of (1) § 10(b) of the Exchange Act, (2) § 17(a) of the Securities Act, and (3) §§ 5(a) and (c) of the Securities Act. *Id.* ¶¶ 41–49. Summons were returned executed on Gordon, Blue Rock, and Windy City on August 7, 2021. Docs. 8–10. On September 1, 2021, the Court ordered Defendants to Show Cause by September 8, 2021, why they had not filed an answer. Doc. 11, Elec. Order. Defendants failed to file any response to the Complaint or the Order to Show Cause. *See* Doc. 12, Elec. Order. The Court ordered the SEC to "file a motion for entry of default and motion for default judgment on or before October 6, 2021." *Id.* The SEC filed its request for the clerk to enter default judgment on October 5, 2021. Doc. 13, Req. Entry Default. On the same day, the clerk entered default for all Defendants and the SEC filed its Motion for Default Judgment. Doc. 14, Entry Default; Doc. 15, Pl.'s Mot. The Court heard oral argument on the pending motion on October 26, 2021. Doc. 20, Elec. Minute Entry.

## II.

## LEGAL STANDARD

Under Rule 55 of the Federal Rules of Civil Procedure, federal courts have the authority to enter a default judgment against a defendant who has failed to plead or otherwise defend, upon

motion of the plaintiff. Fed. R. Civ. P. 55(a)–(b). That being said, "[d]efault judgments are a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations." *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989). "A party is not entitled to a default judgment" merely because "the defendant is technically in default." *Ganther v. Ingle*, 75 F.3d 207, 212 (5th Cir. 1996). "Rather, a default judgment is generally committed to the discretion of the district court." *United States v. 1998 Freightliner Vin #: 1FUYCZYB3WP886986*, 548 F. Supp. 2d 381, 384 (W.D. Tex. 2008) (citing *Mason v. Lister*, 562 F.2d 343, 345 (5th Cir. 1977)).

In determining whether a default judgment should be entered against a defendant, courts have developed a three-part analysis. *See, e.g., 1998 Freightliner Vin #: 1FUYCZYB3WP886986*, 548 F. Supp. 2d at 384. First, courts consider whether the entry of default judgment is procedurally warranted. *See Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998). The factors relevant to this inquiry include:

> [1] whether material issues of fact exist; [2] whether there has been substantial prejudice; [3] whether the grounds for default are clearly established; [4] whether the default was caused by a good faith mistake or excusable neglect; [5] the harshness of a default judgment; and [6] whether the court would think itself obliged to set aside the default on the defendant's motion.

*Id.*

Second, courts assess the substantive merits of the plaintiff's claims and determine whether there is a sufficient basis in the pleadings for the judgment. *See Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (noting that "default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover."). In doing so, courts are to assume, that due to their default, a defendant admits all well-pleaded facts in the plaintiff's

complaint. *Id.* However, a "defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Id.*

Third, courts determine what form of relief, if any, the plaintiff should receive. *See, e.g., 1998 Freightliner Vin #: 1FUYCZYB3WP886986*, 548 F. Supp. 2d at 384. Normally damages are not to be awarded without a hearing or a demonstration by detailed affidavits establishing the necessary facts. *See United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979). However, if the amount of damages can be determined with mathematical calculation by reference to the pleadings and supporting documents, a hearing is unnecessary. *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993). Where a permanent injunction is sought as relief on a default judgment, the court asks "whether the defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a reasonable likelihood of future transgressions." *SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009) (internal quotation marks omitted). The court then "consider[s] a number of factors, including the (1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of scienter, (4) sincerity of the defendant's recognition of his transgression, and (5) likelihood of the defendant's job providing opportunities for future violations." *Id.*

## III.

## ANALYSIS

Applying this three-part analysis, the Court concludes that all relief requested by the SEC is warranted. Therefore, the Court permanently enjoins Defendants from violating the Securities Act and Securities Exchange Act; permanently enjoins Gordon from participating in the issuance, purchase, offer or sale of any securities; prohibits Gordon from serving as an officer or director of any

issuer of registered securities; disgorges Defendants of $826,446 and recalculated prejudgment interests of $134,295.24; and imposes civil penalties of $1,157,930 on Gordon.

A.    *Whether Default Judgment is Procedurally Warranted*

The Court begins its analysis by examining the six *Lindsey* factors and finds that all are satisfied in this case. First, Defendants did not file any responsive pleadings. Consequently, there are no material facts in dispute. *See Lindsey*, 161 F.3d at 893; *Nishimatsu Constr.*, 515 F.2d at 1206 (noting that "[t]he defendant, by his default, admits the plaintiff's well-pleaded allegations of fact."). Second, Defendants' "failure to respond threatens to bring the adversary process to a halt, effectively prejudicing Plaintiff's interests." *Ins. Co. Of W.*, 2011 WL 4738197, at *3 (citing *Lindsey*, 161 F.3d at 893). Third, Defendants have had over three months to file responsive pleadings, explain their failure to do so, or otherwise appear. Therefore, the Court finds the grounds for default are clearly established. *Cf. Elite v. The KNR Grp.*, 216 F.3d 1080 (Table), 2000 WL 729378, at *1 (5th Cir. May 19, 2000) (per curiam) (holding default judgment to be inappropriate where defendant sent letter to court explaining his failure to appear was due to financial privation). Fourth, no evidence supports finding that Defendants' silence results from a "good faith mistake or excusable neglect." *Lindsey*, 161 F.3d at 893. Fifth, despite the severity of a permanent injunction and the $2,118,671.24 sought in disgorgement, interest, and penalties, default is not unusually harsh because Defendants had ample time to defend themselves in this action. *See id.* Finally, the Court is not aware of any facts that would support a finding of "good cause" to set aside the default if challenged by Defendants. *See id.* Therefore, the Court concludes that default judgment is procedurally warranted.

B.      *Whether There is a Sufficient Basis for Judgment in the Pleadings*

The Court finds that there is sufficient factual support in the SEC's Complaint and the evidence presented at the hearing to enter default judgment on all claims. The Court addresses each claim by the SEC below.

As a threshold matter, the Court first finds that the interests sold by Defendants are securities as defined in the Securities Act and Exchange Act. The Securities Act defines "security" as "any note, stock, treasury stock . . . or . . . investment contract." 15 U.S.C. § 77b(a)(1). An investment contract has three requirements: "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." *Williamson v. Tucker*, 645 F.2d 404, 417 (5th Cir. 1981).

The SEC argues all three requirements are met. First, the SEC argues the investors paid cash for their joint venture interests. Doc. 15, Pl.'s Mot., 9 (citing Doc. 1, Compl., ¶ 21). Second, the SEC asserts that the Complaint shows a "broad vertical commonality" that links "the fortune of investors . . . to the efforts and expertise of the promoters." *Id.* at 9–10 (citing *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974)). Per the SEC, the Complaint shows "the investors would benefit from Defendants' ability to (i) refinance the loans on the Rental Properties; (ii) lease the Rental Properties; (iii) successfully renovate the Rental Properties and increase their market values and rents; and (iv) sell the Rental Properties for profits." *Id.* at 10 (citing Doc. 1, Compl., ¶¶ 2, 34–36). Third, the SEC contends the investors expected a profit from their investment when Defendants refinanced the properties, raised the rents, and sold the properties for a profit. *Id.* (citing Doc. 1, Compl., ¶¶ 2, 34–36).

The Court agrees with the SEC that all three requirements have been met and that the Complaint and documents presented at the hearing establish each of the three requirements for the investment contract to qualify as a security. At least eighteen people invested money in Windy City—a common enterprise—and these investors expected a profit ranging from 250%–350% due to the efforts of Gordon and others under his control. SEC Ex. 1, 1; SEC Ex. 2, 2. Thus, the Windy City offering was an investment contract and therefore a security as defined by the Securities Act.

1.    Claim 1: Violations of § 10(b) of the Exchange Act and Rule 10b-5

"The scope of liability under Section 10(b) and Rule 10b–5 is the same." *SEC v. Sethi*, 910 F.3d 198, 206 n.4 (5th Cir. 2018). To prove a violation of § 10(b)[3] or "Rule 10b-5[4] for material representations or misleading omissions, the SEC must prove three elements: '(1) material

---

[3] Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

[4] Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality
of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b.

misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale

of securities, (3) made with scienter.'" *Id*, at 206 (quoting *SEC v. Seghers*, 298 F. App'x 319, 327 (5th

Cir. 2008) (per curiam)). A misrepresentation or omission "is material 'if there is a substantial

likelihood that a reasonable investor would consider the information important in making a decision

to invest.'" *Id.* (quoting *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002)). The

scienter element for § 10(b) and Rule 10b-5 requires "an intent to deceive, manipulate or defraud,

and includes severe recklessness." *Seghers*, 298 F. App'x at 333. Severe recklessness is defined as:

> those highly unreasonable omissions or misrepresentations that involve not merely
> simple or even inexcusable negligence, but an extreme departure from the standards
> of ordinary care, and that present a danger of misleading buyers or sellers which is
> either known to the defendant or is so obvious that the defendant must have been
> aware of it.

*Fine v. Am. Solar King Corp.*, 919 F.2d 290, 296–97 (5th Cir. 1990) (citing *Shivangi v. Dean Witter*

*Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir. 1987)).

> i.    *Violation of § 10(b) and Rule 10b-5(b)*

The SEC alleges that "Gordon had ultimate authority over the content of the written offering

materials that contained false and misleading statements." Doc. 15, Mot., 12 (citing Doc. 1, Compl.,

¶ 20). Therefore, Gordon made the misstatements in the written materials and Blue Rock and

Windy City—through the control of Gordon—made the misstatements "because Windy City was

the issuer of the offering and Blue Rock was the manager of Windy City's operations." *Id.* (citing

Doc. 1, Compl., ¶¶ 6–8). The SEC contends that all of the misstatements were false and misleading

because they "represented that investor funds would be used, primarily, to purchase interests in the

Rental Companies," created the "impression that Blue Rock owned interests in the Rental

Properties," and stated that Windy City had purchased 90% of the Rental Property equity or that

"Blue Rock 'acquired' the Rental Properties." *Id.* (citing Doc. 1, Compl., ¶¶ 20, 24–26, 28, 30–32); *see also* SEC Ex. 2, 2. The SEC further argues that all these statements were material because they provided information on how investors' funds would be spent and who owned the assets. Doc. 15, Mot., 12 (citing Doc. 1, Compl., ¶¶ 20, 28, 32).

Next, the SEC argues Defendants "made false claims about the attributes of the Rental Properties and their projected returns." *Id.* The SEC alleges Defendants' written materials represented that the Rental Properties were "100% rented," represented that Windy City expected to secure new loans with better rates on the Rental Properties, and projected unobtainable investment returns. *Id.* at 12–13 (citing Doc. 1, Compl., ¶¶ 34, 35, 37–38); SEC Ex. 2, 3; SEC Ex. 4, 1. Further, the SEC contends that Gordon made false statements to investors about investing funds to renovate the properties. Doc. 15, Mot., 13. The SEC concludes that all of these statements were material "because they concerned the viability and potential returns on the investment." *Id.*

The SEC further alleges Defendants committed the acts with scienter. *Id.* at 13–14. The SEC contends that "Gordon acted intentionally" or at least "severely recklessly" because he knew Blue Rock or Windy City never acquired the Rental Properties. *Id.* at 13 (citing Doc. 1, Compl., ¶ 29). According to the SEC, Gordon also knew about the misuse of investor funds because he used the funds for his personal benefit. *Id.* (citing Doc. 1, Compl., ¶ 29). The SEC further alleges that "Gordon knew that the Rental Properties were not 100% leased,"[5] refinancing the Rental Properties mortgages was not feasible, and he would use only a "de minimis amount of investor funds to renovate the Rental Properties." *Id.* at 13–14 (citing Doc. 1, Compl., ¶¶ 34–36). The SEC concludes

---

[5] The SEC also represented at the hearing that Mr. Gordon made a similar admission under oath to the SEC during its investigation.

that all of this information proves the lack of "an adequate basis to project 250%–350% returns." *Id.* at 14 (citing Doc. 1, Compl., ¶ 38).

The Court finds that the SEC established all three elements for a violation of § 10(b) and Rule 10b-5(b). For the first element, Defendants made multiple misrepresentations about the ownership and rental status of the Rental Properties in mailings and emails. All of these were material because a reasonable investor would base part of their decision on the ownership and rental status of a property. *See Sethi*, 910 F.3d at 206. For the second element, these material misrepresentations occurred during the Windy City offering, a security. For the third element, Defendants' material misrepresentations were made with knowledge, or at least severe recklessness. Defendants knew the true ownership and rental status of the Rental Properties or, at least, this information was "so obvious that [Defendants] must have been aware of it." *Fine*, 919 F.2d at 296–97. Therefore, the Court finds that Defendants violated § 10(b) and Rule 10b-5(b).

ii.    *Violation of § 10(b) and Rules 10b-5(a) and (c)*

The SEC argues that Defendants "ma[d]e material misrepresentations . . . and continu[ed] to offer units in Windy City" despite having scienter of the drop in equity in the Rental Properties by over 50%, "that not 100% of the units were leased, and that refinancing the mortgages was not possible." *Id.* at 13 (citing Doc. 1, Compl., ¶ 38). The SEC further argues that the element of scienter is established for § 10(b) and Rules 10b-5(a) and (c) for the same reasons as the violations of § 10(b) and Rule 10b-5(b). *Id.* Defendants, according to the SEC, also deceived investors by "transferring investor money to Gordon's personal accounts . . . instead of using money consistent with disclosures

-13-

to investors." *Id.* (citing Doc. 1, Compl., ¶¶ 29. 39–40). The SEC concludes that the "acts constituted devices, schemes, and/or artifices to defraud, as well as deceptive acts, practices, and/or courses of business that operated as a fraud or deceit upon investors." *Id.*

The Court finds that the SEC has established all three elements of a violation of § 10(b) and Rule 10b-5(a) and (c). For the first element, Defendants made multiple misrepresentations about the amount of equity, rental status, and the ability to refinance the mortgages of the Rental Properties. These statements were material because a reasonable investor would base part of their decision on the amount of equity, rental status, and the mortgage status of the Rental Properties. *See Sethi*, 910 F.3d at 206. The second and third elements are the same as the violations of § 10(b) and Rule 10b-5(b). The Court finds these elements satisfied for the reasons stated above. Further, the specific act of transferring investor money into personal accounts defrauded investors. *See SEC v. Gilman*, 2021 WL 4125195, at *9 (N.D. Tex. Sept. 9, 2021) (finding that defendant's commingling of funds in his personal account "involved fraud, deceit, and manipulation").

   2.   Claim 2: Violations of § 17(a) of the Securities Act

Section 17(a) prohibits three varieties of fraudulent conduct and the SEC alleges Defendants violated each variety. Doc. 1, Compl., ¶¶ 44–46. The statute prohibits fraudulent conduct during "the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails . . . :

> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). "To show a violation of § 17(a)[], the Commission must prove (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter." *Seghers*, 298 F. App'x at 327. The scienter element for § 17(a)(1) is the same as for § 10(b) and Rule 10b-5, which "embraces an intent to deceive, manipulate or defraud, and includes severe recklessness." *Id.* at 333. To prove a violation of § 17(a)(2) or § 17(a)(3), the SEC must prove the first two elements, but "need only show that the defendant acted with negligence." *Id.*

    i.  *Violation of § 17(a)(1)*

  The SEC alleges the same conduct discussed above also violated § 17(a)(1). Doc. 15, Mot., 13. The elements for a violation of § 10(b) and Rule 10b-5 and § 17(a) mirror each other except that the SEC must prove the material misrepresentations were made in an "offer or sale of securities" as opposed to a "purchase or sale of securities." *See Seghers*, 298 F. App'x at 327 (listing the elements of each). The SEC proved the Windy City offering included material misrepresentations about the status of the Rental Properties and that the written materials were sent by email. Doc. 15, Mot., 13 (citing Doc. 1, Compl., ¶ 38); SEC Ex. 2, 3; SEC Ex. 3, 2. Because the Court finds that Defendants violated § 10(b) and Rule 10b-5, the Court also finds that Defendants violated § 17(a)(1) for using interstate commerce or the mail system "to employ any device, scheme, or artifice to defraud." 15 U.S.C. § 77q(a)(1).

    ii.  *Violation of § 17(a)(2)*

  According to the SEC, the same alleged conduct by Defendants that violated § 10(b) and Rule 10b-5(b) also violated § 17(a)(2). Doc. 15, Mot., 12–13. The Court agrees and finds that Defendants violated § 17(a)(2). The SEC shows Defendants obtained property—money from investors—through the use of mailings and emails—interstate commerce—which, in addition to the

elements established for a violation of § 10(b) and Rule 10b-5(b), establish a violation of § 17(a)(2). *See* SEC Ex. 2; SEC Ex. 3; SEC Ex. 4. Furthermore, the SEC only needs to establish Defendants acted with negligence and not knowledge or severe recklessness. The Court, having found Defendants acted with knowledge for the § 10(b) and Rule 10b-5(b) violations, finds that Defendants violated § 17(a)(2).

### iii.   *Violation of § 17(a)(3)*

The SEC states that the same factual allegations for § 17(a)(1) also prove a violation of § 17(a)(3). Doc. 15, Mot., 13. Much like § 17(a)(1), the Court finds Defendants violated § 17(a)(3). The SEC shows Defendants engaged in activity to commit a fraud or deceive investors by transferring the investor funds to personal accounts. *See* SEC Ex. 5. Having found that the SEC establishes that Defendants acted with more than negligence, the Court finds that Defendants violated § 17(a)(3).

3.      Claim 3: Violations of §§ 5(a) and (c) of the Securities Act

Sections 5(a)[6] and (c)[7] both required the SEC to prove "that the defendant offered or sold securities as to which no registration statement was in effect and that interstate transportation, communication or the mails were used in connection with that offer or sale." *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 901–02 (5th Cir. 1980). Once the SEC makes a prima facie showing of a violation of §§ 5(a) and (c), the burden shifts to the defendant to prove entitlement to a registration exemption. *Id.* at 902. The statute exempts "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). Relevant to this case, an issuer is "every person who issues or proposes to issue any security." 15 U.S.C. § 77b(a)(4).

---

[6] Section 5(a) provides:

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a).

[7] Section 5(c) provides:

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

15 U.S.C. § 77e(c).

The SEC argues that the interests in Windy City qualify as securities and Defendants sold these interests through the use of instruments of interstate commerce. Doc. 15, Mot., 15 (citing Doc. 1, Compl., ¶¶ 12, 18, 21–22); SEC Ex. 2; SEC Ex. 3; SEC Ex. 4. Specifically, the SEC states that "Defendants marketed the offering and solicited investors through emails and on the internet through social media." Doc. 15, Mot., 15 (citing Doc. 1, Compl., ¶ 18); SEC Ex. 2; SEC Ex. 3; SEC Ex. 4. Additionally, the "Windy City securities and its offering were not registered with the Commission." *Id.* (citing Doc. 1, Compl., ¶ 22).

The Court finds that Defendants violated §§ 5(a) and (c). Having found the Windy City offering qualifies as a security, the SEC sufficiently shows that Defendants sent emails and mailings through instruments of interstate commerce. Further, Defendants did not register the offering with the SEC. Therefore, the Court finds that Defendants violated §§ 5(a) and (c).

C.     *Form of Relief*

The Court **GRANTS** each form of relief requested by the SEC. At the hearing, the Court Ordered the SEC to submit a revised prejudgment interest calculation and the Court **GRANTS** prejudgment interest in the recalculated amount. The Court addresses each of the five forms of relief requested by the SEC below.

1.     Permanent Injunction

The SEC may seek a permanent injunction under § 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and § 21(d) of the Securities Exchange Act, 15 U.S.C. § 78u(d). *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. Unit A July 1981). Under the statutes, the SEC must establish that a "person is engaged or about to engage in" acts that will violate the Securities Act and Securities Exchange Act or rules promulgated thereunder. 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d). Past conduct is not

enough to establish a right to injunctive relief, but injunctive relief may be proper "when the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a 'reasonable likelihood' of future transgressions." *Zale Corp.*, 650 F.2d at 720.

The SEC argues that an injunction is proper in this case against all Defendants "to prevent them from future violations" and to prevent Gordon from "participating in the issuance, purchase, offer, or sale of any securities." Doc. 15, Mot., 15–17. The SEC then analyzes the *Gann* factors for a permanent injunction to argue a permanent injunction is warranted.[8] *Id.* at 16–17. First, the SEC argues Defendants' conduct was egregious because they misused the funds, made "multiple material misstatements," and took actions resulting in a near total loss to investors. *Id.* at 16 (citing Doc. 1, Compl., ¶¶ 7–10, 39–40). Second, this conduct lasted "for over a year and a half" and was, thus, not isolated. *Id.* (citing Doc. 1, Compl., ¶ 1). Third, the SEC argues Defendants acted with a high degree of scienter because they knew "their statements about Windy City were false" and Gordon personally benefitted from the fraud. *Id.* (citing Doc. 1, Compl., ¶¶ 29–30, 32–33, 35–36, 38, 40). Fourth, Defendants' failure to appear in this case demonstrates a lack of remorse. *Id.* Fifth, the SEC argues that Defendants are likely to reoffend because this Court previously entered a judgment against Gordon and one of his other companies for a fraudulent offering. *Id.* at 16–17 (citing Doc. 1, Compl., ¶ 6). The SEC further represented at the hearing that the investigation for the prior judgment against Gordon occurred during the Windy City offering and Gordon knew he was under investigation.

---

[8] The *Gann* factors are: "(1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of scienter, (4) sincerity of defendant's recognition of his transgression, and (5) likelihood of the defendant's job providing opportunities for future violations." *Gann*, 565 F.3d at 940.

The Court finds that the five *Gann* factors support a permanent injunction. First, Gordon committed an egregious number of separate acts. Second, Gordon's conduct was not isolated—it lasted for at least a year and a half and he previously committed similar acts. Doc. 1, Compl., ¶ 1; *Tex. Coastal Energy Co. LLC*, No. 3:18-cv-01587-K. Third, Gordon controlled both of the entities and their bank accounts, which indicates that he had a high degree of scienter. Fourth, Gordon—unlike his prior case—did not appear in this case, which shows a lack of remorse. *See Tex. Coastal Energy Co. LLC*, No. 3:18-cv-01587-K. Fifth, Gordon was previously enjoined from committing the conduct the SEC alleges he committed in this case so he is likely to reoffend. While the complaint in the prior case was filed after the acts in this case, Gordon knew of the investigation into his prior acts and did not change his course of behavior. Gordon's actions demonstrate a pattern of behavior of engaging in deceptive and fraudulent securities offerings. Therefore, the Court issues a permanent injunction as described in the final judgment published with this order.

2.    Officer and Director Bar

Section 77t(e) grants the Court authority to "prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated" § 17(a)(1) of the Securities Act "from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 78 . . . if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer." 15 U.S.C. § 77t(e). Several circuits examine six factors when determining whether an officer and director bar is warranted: "(1) the egregiousness of the underlying violation; (2) the defendant's prior offenses; (3) the defendant's role when he engaged in the violations; (4) the degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that the misconduct will occur again." *SEC v. Provident Royalties*, 2013 WL

5314354, at *7 (N.D. Tex. Sept. 23, 2013) (citing *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995));

*see also SEC v. First Pac. Bancorp.*, 142 F.3d 1186, 1193 (9th Cir. 1998); *SEC v. Bankosky*, 716 F.3d

45, 48–49 (2d Cir. 2013). While these factors have not been adopted by the Fifth Circuit, the Court

weighs these factors below and finds an officer and director bar is warranted.

 The SEC claims that each of the six factors from *Provident Royalties* show a bar is warranted.

Doc. 15, Mot., 17–18. First, the SEC argues that the misstatements about the Windy City offering,

resulting in near total loss to investors, show Gordon's actions were egregious. *Id.* at 18; *see also* SEC

Ex. 1. Second, Gordon previously orchestrated a similar securities fraud offering. Doc. 15, Mot., 18.

Third, Gordon "was ultimately responsible" and had direct and indirect control of the bank

accounts. *Id.* Fourth, the SEC contends that Gordon showed a "high degree of scienter" because he

made the false statements knowing they were false "and personally benefitted from the fraud." *Id.*

Fifth, Gordon used "approximately $826,446 of investor money to fund personal expenses." *Id.*; SEC

Ex. 5. And sixth, the SEC asserts that Gordon is likely to reoffend since he previously committed

fraud in another case. Doc. 15, Mot., 18.

 The Court finds the *Provident Royalties* factors weigh in favor of barring Gordon from serving

as a director or officer of an issuer of securities. Since the factors resemble those from the permanent

injunction, the Court only addresses those that differ from its prior analysis—the defendant's role

and the defendant's economic stake in the violation. *Compare Gann*, 565 F.3d at 940, *with Provident

Royalties*, 2013 WL 5314354, at *7. The third factor examines the role of the defendant. Since

Gordon was the President, CEO, and Manager of Blue Rock, and the Manager of Windy City, this

factor weighs in favor of a bar. For the fifth factor, Gordon had a large financial stake ($826,446) in

the violation, which also weighs in favor of the bar. Having found that the other factors weighed in

favor of a permanent injunction, the Court also finds that the they weigh in favor of barring Gordon from serving as a director or officer of an issuer of securities. *See SEC v. Petros*, 2013 WL 1091236, at *6 (N.D. Tex. Mar. 1, 2013) (barring a defendant from serving as a director or officer after they attempted to raise "$600,000 based on false information" in a penny stock offering).

    3.    <u>Disgorgement</u>

    Section 78u(d)(5) allows the SEC to seek "any equitable relief that may be appropriate or necessary for the benefit of investors" that a "Federal court may grant." 15 U.S.C. § 78u(d)(5). Such equitable relief is limited to the wrongdoer's ill-gotten gains and should flow to the investors in compliance with § 78u(d)(5). *Liu v. SEC*, 140 S. Ct. 1936, 1947–50 (2020); *see also SEC v. Blackburn*, 2021 WL 4737431, at *4 (5th Cir. Oct. 12, 2021) ("Disgorgement cannot exceed the defendants' 'net profits' and must 'be awarded for victims.'"). Furthermore, § 78u(d)(3) specifically grants the SEC the authority to seek disgorgement under § 78u(d)(7). 15 U.S.C. § 78u(d)(3). And § 78u(d)(7) specifically authorizes the SEC to seek disgorgement, which "any Federal court may order." *Id.* § 78u(d)(7). However, disgorgement does not generally permit joint and several liability except under the common law exception "for partners engaged in concerted wrongdoing." *Liu*, 140 S.Ct. at 1949; *see also Blackburn*, 2021 WL 4737431, at *4 (noting that "the district court . . . individually assessed each defendant's gain"); *SEC v. United Energy Partners, Inc.*, 88 F. App'x 744, 747 (5th Cir. 2004) (limiting joint and several liability to "individuals [that] collaborate or have close relationships in engaging in illegal conduct").

    The SEC alleges that Defendants' "ill-gotten gain was $826,446" and that this sum reasonably approximates the disgorgement amount. Doc. 15, Mot., 20 (citing Doc. 15-1, Hahn Decl., ¶ 10). According to the SEC, Defendants received $947,515 from investors and $245,956 "from the

sale of certain Rental Properties" for a total profit of $1,193,471. *Id.* (citing Doc. 15-1, Hahn Decl.,
¶¶ 7–8); SEC Ex. 5. Defendants disbursed $35,541 to investors and had "$331,484 in estimated
business expenses." Doc. 15, Mot., 20 (citing Doc. 15-1, Hahn Decl., ¶¶ 8–9); SEC Ex. 5. Thus,
subtracting the investor disbursement and business expenses from the total profit, the SEC concludes
that Defendants retained $826,446 in ill-gotten gains. Doc. 15, Mot., 20.

Next, the SEC argues it is appropriate for the Court to impose joint and several liability
"because Defendants were 'partners engaged in concerted wrongdoing.'" *Id.* The SEC contends that
because of Gordon's control and ownership of Defendants' bank accounts, Defendants were
"partners in this concerted wrongdoing." *Id.* at 20–21.

The Court awards disgorgement in the amount of $826,446 and finds that the SEC
sufficiently identified the victims at the hearing to ensure the disgorgement flows to the victims. SEC
Ex. 5; *see Blackburn*, 2021 WL 4737431, at *4 (finding the SEC "identified the victims and created
a process for the return of disgorged funds"). The Court also holds Defendants jointly and severally
liable because the evidence sufficiently shows Gordon controlled Blue Rock and Windy City so as
to make them "partners in the concerted wrongdoing." *See Liu*, 140 S. Ct. at 1949. Because Gordon
was the President, CEO, and Manager of Blue Rock, and the Manager of Windy City Asset
Management—the Manager of Windy City—Gordon's control over Blue Rock and Windy City to
makes them partners in his wrongdoing. *See SEC v. Penn*, 2021 WL 1226978, *13 (S.D.N.Y. Mar.
31, 2021) (finding that joint and several liability was proper because the defendant "completely
dominated the [entity defendants]"). Therefore, the Court holds Defendants jointly and severally
liable for the disgorgement award of $826,446.

4.    Prejudgment Interest

The decision to award prejudgment interest rests within the discretion of the district court. *Wolf v. Frank*, 477 F.2d 467, 479 (5th Cir. 1973). The court calculates the interest from the disgorgement amount, *see SEC v. Blatt*, 583 F.2d 1325, 1335 n.30 (5th Cir. 1978) (upholding a disgorgement plus interest award), using the Internal Revenue Service ("IRS")'s underpayment rate. *See SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (approving use of the IRS's underpayment rate for calculating prejudgment interest). The IRS's underpayment rate is "the Federal short-term rate . . . plus . . . 3 percentage points." 26 U.S.C. § 6621(a)(2).

The SEC argues that the disgorgement amount of $826,446 "results in a prejudgment interest amount of $193,520.58." Doc. 15, Mot., 21–22. The SEC calculated this amount by applying the IRS's "underpayment rate from July 2016 (the first month in which Defendants received investor funds for the Windy City offering) through May 2021." *Id.* at 21.

At the hearing, the SEC confirmed that it calculated the interest from the full disgorgement amount starting in July 2016, and that Defendants did not obtain this amount of funds in full on that date. Doc. 15-2, Ex. A. Prejudgment interest covers the "period from the time of defendants' unlawful gains to the entry of judgment," which implies interest begins accruing once Defendants *obtained* their unlawful gains, not when Defendants *began to obtain* their unlawful gains. *See First Jersey Secs., Inc.*, 101 F.3d at 1477. Because the Defendants did not accrue the full disgorgement amount on the first day of the Windy City offering, the Court, at the hearing, directed the SEC to submit a new calculation of prejudgment interest that begins on the last day of the Windy City offering. The SEC submitted this recalculation on the same day of the hearing with a prejudgment interest amount of $134,295.24.

The Court awards prejudgment interest in the amount of $134,295.24 based upon the SEC's recalculation.

5.    Civil Penalties

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the imposition of penalties against a person who has violated either Act. 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). Both statutes provide three tiers of penalties with amounts ranging from $5,000 to $500,000 or the "gross amount of the pecuniary gain." 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B). The maximum penalty amount is either "[t]he maximum penalty amount for the previous calendar year[] or . . . [that] amount adjusted for inflation." 17 C.F.R. § 201.1001(b). A first tier penalty is appropriate when a person violates either Act. 15 U.S.C. § 77t(d)(2)(A); 15 U.S.C. § 78u(d)(3)(B)(i). A second tier penalty is appropriate for a violation that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii). And a third tier penalty is appropriate for a second tier violation that "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii). Courts evaluate the following factors when determining whether to impose a civil penalty:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Offill*, 2012 WL 1138622, at *3 (N.D. Tex. Apr. 5, 2012) (citing *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004)).

-25-

The SEC requests that the Court impose third tier penalties in the amount of $1,157,930. Doc. 15, Mot., 23. For the first two factors, the SEC alleges "Gordon's conduct was egregious, and he acted with a high degree of scienter." *Id.* Third, the SEC alleges Gordon cost at least eighteen investors nearly $1,000,000. *Id.* Fourth, the conduct "persisted for a year and a half" and "permeated every key aspect of the Windy City offering." *Id.* Fifth, Gordon has not admitted or appeared in these proceedings. *Id.* Thus, the SEC requests Defendants' gross pecuniary gain as the civil penalty. The SEC calculates this as "the amount raised from investors ($947,515)," plus the proceeds "from the sale of the Rental Properties ($245,936)," minus the amount "distributed to investors ($35,541)" for a total civil penalty of $1,157,930. *Id.* (citing Doc. 15-1, Hahn Decl., ¶¶ 8, 10).

The requested civil penalties exceed the disgorgement amount because of the inclusion of $331,484 in business expenses. *Id.* at 23–24 (acknowledging such, but arguing other courts excluded business expenses). Civil penalties are "focus[ed] on the gross amount of pecuniary gain—as opposed to disgorgement, which is focused on simple gains." *SEC v. Amerindo Inv. Advisors Inc.*, 2014 WL 2112032, at *10 (S.D.N.Y. May 6, 2014), *aff'd*, 639 F. App'x 752 (2d Cir. 2016). Therefore, the SEC correctly calculates the maximum amount of civil penalty possible.

The SEC also persuasively argues that all five factors weigh in favor of such a penalty and the permanent injunction analysis above has already addressed three of these factors—the egregiousness of Gordon's conduct, the degree of Gordon's scienter, and the recurrent nature of Gordon' conduct. For the third factor, the SEC sufficiently demonstrated the loss of nearly $1,000,000 for eighteen investors. SEC Ex. 1. For the fifth factor, Gordon's financial situation is not known and no facts have been presented to the Court. So, this factor is neutral. Therefore, the Court imposes $1,157,930 in civil penalties.

## IV.

## CONCLUSION

For the above reasons, SEC's Motion for Final Judgment by Default (Doc. 15) is **GRANTED** in full with the recalculated prejudgment interest. The Court will enter separate final judgments consistent with this memorandum opinion and order.

SO ORDERED.

SIGNED: November 1, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE